En el Tribunal Supremo de Puerto Rico

| ARIEL PEREZ VEGA Y ADA MARY ROMAN PADILLA<br><br>    Apelantes<br><br>    V.<br><br>PROCURADOR ESPECIAL DE RELACIONES DE FAMILIA<br><br><br>    Apelados | Apelación<br><br>99TSPR64 |
| --- | --- |

Número del Caso: AC-95-16

Abogados de la Parte Apelante: Lic. Luciano Sánchez Martínez

Abogados de la Parte Apelada: Hon. Carlos Lugo Fiol
Procurador General

Lic. Delmarie Vega Lugo
Procuradora General Auxiliar

Abogados de la Parte Interventora:

Tribunal de Instancia: Superior, Sala de Arecibo

Juez del Tribunal de Primera Instancia: Hon. Myrta Irizarry Ríos

Tribunal de circuito de Apelaciones: III, Arecibo, Utuado

Juez Ponente: Hon. Giménez Muñoz

Voto concurrente:  Hon. Arbona Lago

Panel integrado por:  Pres. Juez Arbona Lago y los Jueces Salas Soler y Giménez Muñoz

Fecha: 4/27/1999

Materia:


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ariel Pérez Vega y
Ada Mary Román Padilla

    Apelantes

     v.                                  AC-95-16

Procurador Especial de
Relaciones de Familia

    Apelada.

Opinión del Tribunal emitida por el Juez Asociado señor CORRADA DEL RIO

San Juan, Puerto Rico, a 27 de abril de 1999.

I

Los apelantes, Ariel Pérez Vega y Ada Román Padilla ("los apelantes"), quienes han convivido en una relación concubinaria estable sin intenciones de contraer matrimonio durante al menos diez años, presentaron el 28 de enero de 1994 una petición para adoptar conjuntamente a la menor A.M.Q.M., quien vivía con ellos desde los veinte (20) días de nacida.[1]

La Procuradora Especial de Relaciones de Familia ("la Procuradora") se opuso a la petición de adopción debido a que los apelantes incumplían

---

[1] Los padres biológicos de la niña, ambos desempleados, asintieron mediante declaración jurada a la adopción de su hija por parte de los peticionarios.

con el requisito de estar casados entre sí, establecido por el Código Civil para poder adoptar conjuntamente. Argumentó la Procuradora que el incumplimiento de este requisito sustantivo privaba de jurisdicción al Tribunal.

No obstante lo anterior, el Tribunal Primera Instancia, Sala Superior de Arecibo (Hon. Myrta Irizarry Ríos, Juez), soslayó los argumentos de la Procuradora y permitió la adopción conjunta de la menor por los concubinos. Esta apeló ante el Tribunal de Circuito de Apelaciones, el cual revocó la sentencia recurrida.

Inconformes, los apelantes acuden ante nos mediante recurso de apelación formulando el siguiente señalamiento de error:

> "Erró el Honorable Tribunal de Circuito de Apelaciones, Circuito Regional III (Arecibo) al resolver que, en las circunstancias de este caso, el requisito establecido por el artículo 131 del Código Civil vigente (31 L.P.R.A. 352) de que para poder adoptar una pareja tiene que estar legalmente casada, no constituye un discrimen o clasificación no permitida por las secciones 1, 7 y 8 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico."

Acogido el recurso de apelación y habiendo comparecido las partes, procedemos a resolver.

II

El artículo controlante del Código Civil de Puerto Rico, **vigente al momento de autorizarse la adopción**, disponía en su primer párrafo: **"Nadie podrá ser adoptado por más de una persona, salvo el caso en que los adoptantes estuvieren casados entre sí."** Art. 131 del Código Civil, Ley Núm. 86 de 15 de junio de 1953, L.P.R. pág. 305 (1953).

Anteriormente hemos establecido que este requisito, así como los demás requisitos sustantivos para cualificar como un adoptante hábil, son de carácter jurisdiccional. Esto es, que el incumplimiento con uno sólo de ellos priva de jurisdicción al Tribunal. *M.J.C.A. v. J.L.E.M.,* 124 D.P.R. 910 (1989); *Ex-Parte Warren,* 92 D.P.R. 299 (1965).

> Los requisitos sustantivos para ser adoptante **son jurisdiccionales. Su incumplimiento priva de jurisdicción al tribunal.** *Ex-Parte Warren, supra.* Otros requisitos sustantivos son: el del consentimiento del adoptado en los casos que proceda, el de sus padres o tutor cuando sea necesario y el del padre que lo haya reconocido —Art. 135 del Código Civil, 31 L.P.R.A. sec. 536— **y el que los cónyuges adoptarán conjuntamente salvo lo dispuesto en el Art. 131 del Código Civil. 31 L.P.R.A. sec. 532;** *M.J.C.A. v. J.L.E.M., supra,* pág. 921. (Enfasis nuestro.)

El Estado permite la adopción conjunta, a modo excepcional, sólo cuando los adoptantes estén casados entre sí. Véase *Ex Parte J.A.A.*, 104 D.P.R. 551, 557 (1976).

En 1995, la legislación en torno a la adopción fue enmendada extensamente con el propósito de flexibilizar y expeditar los mecanismos de adopción para que esa institución social pudiese ser utilizada de forma más amplia y rápida por aquellos que deseen ser padres adoptivos.[2]

---

[2] Véase Exposición de Motivos de la Ley Núm. 9 de 19 de enero de 1995. Leyes de Puerto Rico de 1995, págs. 60-61.

A pesar de que el Legislador se dio a la tarea de eliminar obstáculos innecesarios y agilizar los mecanismos para facilitar la adopción, éste eligió conservar el carácter excepcional de la adopción conjunta y mantuvo el requisito de que sólo podrían adoptar conjuntamente un hombre y una mujer casados entre sí. Véase Art. 133 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 534.

Dispone el Art. 133 del Código Civil, según enmendado por la Ley Núm. 8 de 19 de enero de 1995[3]: "Nadie podrá ser adoptado por más de una persona, salvo que los adoptantes, estuvieren casados entre sí, en cuyo caso se deberá adoptar conjuntamente." 31 L.P.R.A. sec. 534.

La redacción originalmente propuesta para dicho artículo en el Proyecto del Senado 944 de 16 de noviembre de 1994 y en el de su contraparte en la Cámara de Representantes, P. de la C. 1607, de 17 de noviembre de 1994, **permitía expresamente la adopción conjunta por parte de parejas que sostuvieren una relación consensual**. Sin embargo, el legislador decidió no autorizar dicho tipo de adopciones en la redacción final del artículo. Asimismo, ambos proyectos contenían el último párrafo de dicho artículo que trata sobre la discreción del tribunal "para resolver situaciones como las dispuestas en este artículo".[4]

---

[3] Leyes de Puerto Rico de 1995, pág. 45, *et seq.*
[4] 31 L.P.R.A. 534.

El texto del artículo propuesto en los proyectos de ambos cuerpos legislativos rezaba de la siguiente manera:

> Nadie podrá ser adoptado por más de una persona, salvo que los adoptantes estuvieren casados entre sí **o sostuvieren una relación consensual. En ambos casos se deberá adoptar conjuntamente.**
>
> Un cónyuge podrá adoptar individualmente en cualquiera de los siguientes casos:
>
> > (a) [...]
> >
> > (b) [...]
> >
> > (c) [...]
>
> **No obstante lo anterior, un miembro de una relación consensual podría adoptar individualmente cuando el bienestar y conveniencia del adoptando así lo requiriere. Si el peticionario contrae matrimonio después de presentada la petición de adopción, el derecho del peticionario de ser adoptante prevalecerá, excepto que por acuerdo de ambos cónyuges, éstos podrán adoptar conjuntamente si así lo decretare el tribunal; considerando siempre como eje central, en ambas situaciones, el bienestar y conveniencia del hijo menor de edad.**
>
> El tribunal tendrá discreción para resolver situaciones como las dispuestas en este artículo, teniendo siempre como guía de su decisión el bienestar y conveniencia del menor. (El texto en negrita fue eliminado de la legislación que finalmente fue aprobada).

Esta redacción fue rechazada por varios ponentes bajo el fundamento de que la adopción conjunta debe reservarse para aquellas parejas unidas por un vínculo matrimonial.[5]    Al contrastar la redacción original del proyecto

---

[5] Entre los ponentes que se opusieron a esta modalidad de adopción conjunta se encontraba el profesor Pedro F. Silva Ruiz, quien señaló en su comparecencia del 2 de agosto de 1993:

> Me preocupa [...] la calificación de "matrimonio natural" [que se le había dado en el proyecto] a la unión consensual, a la manera de matrimonio, de personas solteras, de sexo diferente.
>
> El matrimonio, que jurídicamente es uno, es aquél que cumple con los dictámenes de la ley (ver art. 68 del Código Civil vigente, 31 L.P.R.A. 221 [y] ss.) y es la institución que este Pueblo ha consagrado para transmitir, de una generación a otra, sus valores.
>
> Tolera nuestra sociedad otras formas de convivencia, como vías culturales alternativas entre personas, de determinada capacidad. Pero, a mi juicio, tan sólo

con la del Artículo 133 vigente, colegimos claramente que el legislador, conscientemente, decidió reservar exclusivamente la adopción conjunta en el caso de parejas casadas y excluir de este tipo de adopción a las parejas consensuales.

Vemos pues, que enmarcado dentro de un interés apremiante de velar por el bienestar del menor, de promover la conservación de la unidad familiar y de prevenir la desintegración de la familia, caracterizada como la institución social más importante[6], el Estado mantuvo la certeza del vínculo matrimonial, como requisito de carácter

jurisdiccional para la adopción conjunta.

### III

Los apelantes impugnan la constitucionalidad del anterior artículo 131, vigente al solicitar la adopción en el caso de autos, al éste impedir la adopción conjunta de la menor por no estar ellos casados entre sí. Alegan que viola su derecho a la igual protección de las leyes debido a que establece una clasificación sospechosa por razón de condición social; y que atenta, en términos generales, contra su derecho a la intimidad en contravención a las Secciones 1, 7 y 8 del Artículo II de la Constitución de Puerto Rico. Veamos.

La Sección 7 del Art. II de la Constitución de Puerto Rico establece que "[n]inguna persona será privada de su libertad o propiedad sin el debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes".[7] (Enfasis suplido).

La garantía de la igual protección de las leyes "no prohibe o impide que el Estado establezca clasificaciones para descargar adecuada y eficientemente sus funciones [...]", *San Miguel Lorenzana v. E.L.A.,* Op. de

---

aquéllos que han cumplido con las disposiciones de ley en cuanto a su convivencia diaria como marido y mujer pueden adoptar. [...]

En Puerto Rico no hay ley general que regule el concubinato –que el proyecto denomina "matrimonio natural"-, sino [el] reconocimiento de algunos efectos económicos por legislación especial. La jurisprudencia le ha reconocido tan sólo efectos patrimoniales (económicos) al concubinato.

[6] Ley Núm. 8 de 19 de enero de 1995, *supra*, pág. 60

1 de noviembre de 1993, 134 D.P.R. ___ (1993), 93 J.T.S. 135; ni exige que se le dé un trato igual a todas las personas. "Lo que prohibe es el trato desigual injustificado". *Id.* (citas omitidas).

"[E]l principio cardinal en que se funda constitucionalmente la igual protección de las leyes es el de trato similar para personas similarmente situadas". (Cita omitida.) *Berberena v. Echegoyen,* 128 D.P.R. 864, 878 (1991).

Cuando se impugna la validez de un estatuto o de una actuación gubernamental por atentar contra la igual protección de las leyes, los tribunales, ordinariamente, utilizarán un escrutinio tradicional o de nexo racional para comprobar la constitucionalidad del mismo o la misma. Este escrutinio sólo exige que el Estado demuestre la existencia de un interés legítimo en la actuación gubernamental y que el medio utilizado para adelantar dicho interés tiene un nexo racional con el mismo. "La ley será constitucional siempre que pueda concebirse una situación que justifique la clasificación". *Berberena v. Echegoyen, supra,* pág. 879; *Vélez v. Secretario de Justicia*, 115 D.P.R. 533, 538 (1984).

> Bajo el escrutinio tradicional o de nexo racional, una clasificación legislativa no debe ser declarada inválida o inconstitucional a menos que sea claramente arbitraria; esto es, que no exista un interés legítimo del Estado o que no pueda establecerse nexo racional alguno entre la clasificación y un interés estatal. Aplicando este criterio se ha resuelto que es constitucional una ley siempre que pueda concebirse razonablemente una situación de hechos que justifique la clasificación, teniendo el peso de la prueba aquel que alega la inconstitucionalidad de la legislación en controversia. (Cita omitida.)
>
> Por otro lado, este Tribunal ha establecido que cuando el planteamiento de inconstitucionalidad, bajo esta cláusula, se hace contra una legislación de tipo económico o social, el criterio tradicional mínimo solo exigirá que la clasificación no sea arbitraria y que la misma pueda establecer un nexo racional con los propósitos del estatuto. *Rodríguez v. E.L.A.,* 131 D.P.R. 562, 582 (1992). (Citas omitidas).

---

[7] 1 L.P.R.A. Art. II, Sec. 7

No obstante, si estamos ante una clasificación sospechosa o un acto estadual que afecte algún derecho fundamental, se aplicará el escrutinio estricto para evaluar la validez de la acción estadual.

Son clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. *San Miguel Lorenzana v. E.L.A.*, *supra*. Por otro lado, se reconocen como derechos fundamentales el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto, a la protección contra ataques abusivos a la honra y el derecho de intimidad. *Id.*

Si se dan las circunstancias particulares para la utilización del escrutinio estricto, la ley o la actuación impugnada se presume inconstitucional y le corresponde al Estado demostrar que existe un interés apremiante que la justifique y que el medio utilizado para promover dicho interés es el necesario, esto es, que es el menos oneroso para adelantarlo. *San Miguel Lorenzana v. E.L.A., supra*; *Berberena v. Echegoyen*, *supra*.

IV

Los apelantes alegan que debemos utilizar el escrutinio estricto debido a que el Art. 131 establece una clasificación sospechosa por condición social y además viola su derecho fundamental a la intimidad. No tienen razón.

**A. Discrimen por Origen o Condición Social**

La Sección 1 del Art. II de la Constitución de Puerto Rico reza en su parte pertinente de la siguiente manera: "La dignidad del ser humano es inviolable. Todos los hombres son creados iguales ante la ley. No podrá establecerse discrimen alguno por motivo de: [...] **origen o condición social** [...]." (Énfasis nuestro).

El discrimen por origen o condición social, según contemplado por la Convención Constituyente en los debates con antelación a la aprobación de la Constitución, significa que "no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños

y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes."[8]

En este sentido, también se expresó el delegado Sr. González Blanes al manifestar su conformidad con la eliminación de la frase "posición económica" dentro de las prohibiciones de discriminación contempladas por la Sec. 1, Art. II de la Constitución, por entender que dicho concepto de posición económica estaba incluido dentro de la expresión "origen o condición social". A tales efectos, señaló el delegado: "Nos satisface la eliminación de `posición económica´ porque entiendo que ahí está incluida la dificultad que levanta el compañero Reyes Delgado al ponerse más adelante `origen o condición social´". *Id.,* Tomo 3, pág. 2245.

Finalmente, el Informe de la Comisión de la Carta de Derechos confirma esta visión, al señalar que con la inclusión de la prohibición de discriminación por "origen social" se "reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivos de origen o condición social". *Id.,* Tomo 4, pág. 2562.

Vemos pues, cómo la expresión "origen o condición social" se refiere a discrímenes económicos y sociales y no a distinciones razonables que puedan surgir por el estado civil de las personas. Véase Serrano Geyls, *Derecho Constitucional de E.U. y P.R.,* Vol. II, pág. 1189[9]. Los apelantes, no especifican de qué manera particular el Art. 131 del Código Civil discrimina en su contra por "origen o condición social" ni hacen una exégesis aceptable de la disposición constitucional para demostrar que el requisito jurisdiccional de estar casados para poder adoptar conjuntamente constituye discrimen por condición social.

A la luz de lo anterior, concluimos que la clasificación entre parejas casadas y no casadas no guarda relación con el discrimen por "origen o

---

[8] Exposición del Delegado, Sr. Benítez, Diario de Sesiones de la Convención Constituyente, Tomo 2, pág. 1582.

[9] El profesor Serrano Geyls también señala que la disposición sobre el discrimen por condición social estaba "íntimamente ligada a la Sec. 20 del Artículo que reconocía varios derechos económicos y sociales". *Serrano Geyls, ob. cit.,* pág. 1189.

condición social" según interpretado en el contexto constitucional, por lo que debemos analizar la validez del estatuto impugnado, no bajo el riguroso prisma del escrutinio estricto como nos piden los apelantes, sino utilizando el escrutinio tradicional de nexo racional.

Enfocada la controversia en su justa perspectiva jurídica, debemos determinar si la clasificación hecha por el Art. 131 del Código Civil, vigente al momento de solicitarse la adopción, responde a algún interés legítimo del Estado al reservar al hombre y la mujer casados entre sí la facultad exclusiva de adoptar conjuntamente, y si el medio utilizado para adelantar dicho interés guarda una relación racional con dicho interés del Estado.

La Exposición de Motivos de la ley que enmendó recientemente los artículos del Código Civil sobre la adopción, Ley Núm. 8 del 19 de enero de 1995,[10] expresa claramente el interés legítimo del Estado en permitir la adopción conjunta únicamente en aquellos casos en los que los adoptantes estén casados entre sí.

> Es política pública e <u>interés apremiante</u> del Estado promover el bienestar y el mejor interés de los menores, y protegerlos de estar expuestos a condiciones y experiencias que sean nocivas a su desarrollo físico, emocional y moral.
>
> [...]
>
> Los niños de Puerto Rico merecen tener la oportunidad de que sus vidas se desarrollen al calor de un hogar, sintiendo el amor de unos padres. <u>La institución de la familia es el pilar principal de nuestra sociedad,</u> por lo tanto hay que brindarle a esos niños la oportunidad de formar parte de un seno familiar. (Subrayado nuestro.)[11]

En la misma línea se expresó el legislador en la Exposición de Motivos de la Ley Núm. 9 de 19 de enero de 1995, que enmendó el procedimiento para la adopción de menores. Allí se consignó que:

> Es de conocimiento general <u>el interés apremiante</u> del Estado, <u>el que cuida y promueve celosamente a favor de la conservación de la unidad familiar y en prevención de la desintegración de la institución social más importante: la familia.</u> Es un derecho inalienable de los

---

[10] Véase Leyes de Puerto Rico de 1995, págs. 46-47.
[11] *Id.,* pág. 46.

niños el poder vivir y crecer dentro del seno de un hogar feliz y al calor de sus padres. No obstante, también es deber social elevado a nivel constitucional en Puerto Rico, el tomar todas las medidas al alcance del Estado para la protección y el bienestar de los menores de edad, quienes son campo fértil para toda clase de abusos y abandonos.[12] (Subrayado nuestro.)

Por otro lado, sabido es que el matrimonio es institución fundamental y eje central de nuestra sociedad, que continúa siendo la base de la familia y de la vida social.[13]

"[S]eguimos valorando la familia matrimonial como el régimen socialmente más deseable. Además en nuestro país existe una clara política pública de protección y fortalecimiento de la familia, y el matrimonio es el paso para su formación." *Mercado, Quilinchini v. U.C.P.R.,* Op. de 27 de junio de 1997, 143 D.P.R. ___ (1997), 97 J.T.S. 106.[14]

El matrimonio goza de un carácter institucional que—genera entre los contrayentes un estado civil que es fuente

---

[12] Exposición de Motivos, Ley Núm. 9, *supra,* Leyes de Puerto Rico de 1995, pág. 60.

[13] Dra. R.E. Ortega Vélez, *Lecciones de Derecho de Familia* 183(1997).

[14] Citando a *Sostre Lacot v. Echlin of P.R., Inc.,*126 D.P.R. 781, 791 (1990), (Voto dis. del Juez Asociado señor Negrón García) Allí también se dijo: "Parecería innecesario esgrimir argumentos en defensa del valor social del matrimonio. Basta apuntar que como institución civil claramente establecida y protegida por el orden social y jurídico ocupa un lugar predominante en la sociedad contemporánea que sobrepasa los límites de lo controvertible. [...]" *Id,* pág. 790.

de obligaciones y derechos. Es una institución "en virtud la cual un hombre y una mujer se obligan mutuamente a ser esposo y esposa y a cumplir el uno para el otro los deberes que la ley les impone". Art. 68, Código Civil de Puerto Rico, 31 L.P.R.A. Sec. 221.

El Art. 88 del Código Civil de Puerto Rico,[15] consigna los deberes mínimos con los que las parejas se comprometen a cumplir <u>libremente</u> dentro del matrimonio: "[l]os cónyuges están obligados a vivir juntos, guardarse fidelidad y socorrerse mutuamente". La relación matrimonial crea un vínculo entre los contrayentes.

Precisamente el carácter institucional del matrimonio, el estado civil que éste genera y las obligaciones y garantías que dicho vínculo confiere, ofrecen cierta seguridad y estabilidad necesarias para la protección de los menores.

En vista del reconocido interés apremiante que posee el Estado en garantizar el bienestar de los menores adoptados, y de "protegerlos de estar expuestos a condiciones y experiencias que sean nocivas a su desarrollo físico, emocional y moral"[16], consideramos a la institución de la familia matrimonial como fuente de estabilidad, protección y educación para el menor. Por lo tanto, su elección por parte del legislador como única excepción a la de ordinario prohibida adopción conjunta, guarda una relación racional con el referido interés público.

## B. La violación al derecho a la intimidad

Los apelantes exponen escuetamente que la clasificación entre parejas casadas y no casadas es también sospechosa por infringir su derecho fundamental a la intimidad como concubinos que no desean legalizar su relación contrayendo matrimonio. Sin embargo, no explican ni exponen cuál es el ámbito de intimidad que está siendo violado por la disposición en controversia del Código Civil ni aspecto alguno de la doctrina en torno al derecho a la intimidad que pueda ser extendido al caso de autos.

---

[15] 31 L.P.R.A. sec. 281
[16] Exposición de Motivos de la Ley Núm. 8, *supra*, pág. 46.

El Art. II, Sec. 8 de la Constitución de Puerto Rico establece que "[t]oda persona tiene derecho a protección de la ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar".

Esta sección, junto a la sección primera del mismo artículo que expresa el principio de que la dignidad del ser humano es inviolable, es la fuente del derecho a la intimidad en nuestro esquema constitucional.

El derecho a la intimidad es uno de los derechos fundamentales de mayor rango en nuestro ordenamiento constitucional. *Pueblo v. Santiago Feliciano*, Op. de 9 de noviembre de 1995, 139 D.P.R. ___ (1995), 95 J.T.S. 154; *Arroyo v. Rattan Specialties*, 117 D.P.R. 35 (1986); *P.R.T.C. v. Martínez*, 114 D.P.R. 328 (1983).

Es bien conocido que el derecho a la intimidad protege la decisión de aquellas parejas que <u>deseen contraer matrimonio</u> debido a que <u>la libertad para casarse</u> ha sido reconocida históricamente como uno de los derechos personales vitales, esencial para la búsqueda de la felicidad por parte de las personas libres. *Loving v. Virginia*, 388 U.S. 1 (1967). Después de todo, el matrimonio es uno de los derechos civiles básicos del ser humano, fundamental para nuestra propia existencia y supervivencia. *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942).

Más recientemente, el Tribunal Supremo de los Estados Unidos ha señalado que el derecho al matrimonio es parte fundamental del derecho a la intimidad. *Zablocki v. Redhail*, 434 U.S. 374 (1978). Véase además *Planned Parenthood v. Casey, 505 U.S. 833 (1992); Whalen v. Roe*, 429 U.S. 589 (1977); *Carey v. Population Services International*, 431 U.S. 678 (1977); *Cleveland Board of Education v. La Fleur,* 414 U.S. 632 (1974); *Griswold v. State of Connecticut*, 381 U.S. 479 (1965). Véase en Puerto Rico a *Figueroa Ferrer v. E.L.A.,* 107 D.P.R. 250 (1978).

Sin embargo, aún en el caso del matrimonio, el Tribunal Supremo federal ha reconocido que el Estado puede imponer legítimamente condiciones razonables al mismo, siempre y cuando no se interfiera sustancialmente con la decisión libérrima de entrar en una relación marital. Véase *Zablocki v. Redhail, supra; Califano v. Jobst,* 434 U.S. 47 (1977).

El caso de autos dista considerablemente de la situación anterior. Contrario a los casos reseñados, los apelantes no desean estar en una relación marital para formalizar su unión. Ellos desean permanecer en una unión de hecho o relación *more uxorio.* De entrada, carecen de uno de los elementos esenciales que le confieren a la decisión de casarse su alta estima en la jerarquía de derechos constitucionales. Esto es, el querer entrar en una unión que se eleva al rango de institución legal por los derechos y deberes jurídicos que de ella dimanan.

Una pareja consensual que desea adoptar conjuntamente, tampoco ha visto su ámbito de intimidad penetrado injustificadamente por el Estado al éste exigir, como *conditio sine qua non* para autorizar la adopción conjunta, el que los adoptantes estén casados entre sí.

Debido al interés apremiante del Estado en garantizar el bienestar del menor, la adopción es una institución civil meticulosamente regulada por la legislación sobre la materia, tanto en su aspecto sustantivo como en lo procesal. El requisito de que los adoptantes estén casados entre sí, impuesto por el Art. 131 para poder adoptar conjuntamente, no representa una intromisión indebida en la vida privada de los apelantes, sino una salvaguarda de los mejores intereses del menor, consustancial con los poderes de *Parens Patriae* del Estado. El Estado no obliga a los apelantes a casarse, sino que dentro del procedimiento de adopción de un menor, al cual se comparece voluntariamente, requiere simplemente que cumplan con uno de los requisitos sustantivos de rango jurisdiccional que la ley establece para poder adoptar conjuntamente.

Como ya discutimos anteriormente, la condición impuesta por el Art. 131 responde a un interés apremiante del Estado y el medio utilizado para adelantarlo guarda una relación racional con el mismo. Por ello, no albergamos dudas sobre la validez constitucional del estatuto.

V

Las consideraciones en torno a la conveniencia de la adopción por parte de la pareja consensual en ese caso particular son inmateriales para resolver la controversia ante nos. Ante la clara manifestación de la intención legislativa de excluir la adopción conjunta por parejas consensuales, la autorización por parte de este Tribunal de ese tipo de adopción constituiría una usurpación del poder legislativo al entrar en el ámbito

de la elaboración y diseño de política pública que ha sido reservada por nuestra Constitución a las otras dos ramas de gobierno.

Sólo a las ramas legislativa y ejecutiva les corresponde establecer e implantar la política pública del Estado, por lo que la revisión judicial no puede tornarse en una reevaluación de la sabiduría o corrección de una medida legislativa o actuación impugnada. Véanse, *San Miguel Lorenzana v. E.L.A., supra; Berberena v. Echegoyen, supra,* pág. 881; *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 66 L. Ed. 2d 659, 101 S. Ct. 715 (1981); *Schweiker v. Wilson,* 450 U.S. 221, 67 L. Ed. 2d 186, 198, 101 S. Ct. 1074 (1981); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 87 L. Ed. 2d 313, 321, 105 S. Ct. 3249 (1985). "**Aunque la clasificación no parezca ser la manera más acertada, adecuada, sabia y eficiente de adelantar el propósito legislativo, el tribunal debe mantener su constitucionalidad una vez se demuestre que existe una relación racional entre ésta y el propósito esbozado. Por lo tanto, la intervención judicial será muy limitada**". *Serrano Geyls, supra*, Vol. 2, pág. 1086, citado en *San Miguel Lorenzana v. E.L.A., supra.*(Enfasis nuestro).

La inequívoca intención legislativa, ratificada por recientes enmiendas a las disposiciones reguladoras de la adopción, nos obligan a sostener la decisión del Tribunal de Circuito de Apelaciones al revocar la sentencia del Tribunal de Primera Instancia. Los argumentos sobre los cuales se basa la sentencia dictada por el foro de instancia van dirigidos a cuestionar la sabiduría o deseabilidad de la norma impugnada y no a demostrar la infracción de algún derecho fundamental de los apelantes. En este aspecto excedió sus facultades constitucionales al adjudicarse funciones del poder legislativo. El poder judicial no puede convertirse en un poder supralegislativo con el fin de juzgar la sapiencia o deseabilidad de las determinaciones de política pública que establece la Asamblea Legislativa en áreas que no afectan derechos fundamentales ni crean clasificaciones sospechosas. *San Miguel Lorenzana v. E.L.A., supra.* (Cita omitida).

Como hemos visto, la institución del matrimonio sienta unas garantías de estabilidad que son fruto de las obligaciones libremente contraídas por los cónyuges. Por ello, goza acertadamente de un trato privilegiado en nuestra sociedad, por encima de otras formas de relaciones interpersonales. Si bien es cierto que el matrimonio no es una garantía infalible de la preservación de la unidad de las parejas legalmente casadas, tampoco lo es la relación consensual, pero en la unión matrimonial existe un vínculo legal ante el estado que no está presente en la consensual.

En vista de lo anterior, sostenemos la constitucionalidad de la disposición impugnada y confirmamos la sentencia del Tribunal de Circuito de

Apelaciones. Se devuelve el caso al foro de instancia para que proceda conforme a lo aquí dispuesto.

Se dictará sentencia de conformidad.


                                    BALTASAR CORRADA DEL RIO
                                       JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ariel Pérez Vega y
Ada Mary Román Padilla

    Apelantes

     v.                             AC-95-16

Procurador Especial de
Relaciones de Familia

    Apelada.


SENTENCIA

San Juan, Puerto Rico, a 27 de abril de 1999.

    Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida por el Tribunal de Circuito de Apelaciones el 23 de agosto de 1995, y se devuelve el caso al Tribunal de Primera Instancia para que proceda conforme a lo aquí resuelto.

    Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García, la Juez Asociada señora Naveira de Rodón y el Juez Asociado señor Fuster Berlingeri disienten con opinión escrita.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ariel Pérez Vega y
Ada Mary Román Padilla

   Apelantes

                    AC-95-16

      v.

Procurador Especial de
Relaciones de Familia

   Apelada

Opinión Disidente del Juez Asociado señor Negrón García

San Juan, Puerto Rico, a 27 de abril de 1999

Hace veintitrés (23) años sentenciamos: "La maternidad [y paternidad] espiritual que los peticionari[os] ha[n] engendrado con el cuidado, amor y educación que durante años ha[n] dispensado a la niña protagonista de este recurso, y que intenta[n] consolidar jurídicamente, **no puede ser a expensas de una interpretación que exija un matrimonio donde no lo hay.... Tal interpretación plantea serias interrogantes sobre posible discrimen constitucional por razón de nacimiento**. Art. II, Sec. 1 Constitución." <u>Ex parte J. A. A.</u>, 104 D.P.R. 551, 562 (1976). Op. Concurrente. (Énfasis y corchetes nuestros).

El precepto constitucional aludido establece la inviolabilidad de la dignidad del ser humano, y se proyecta en una prohibición contra todo discrimen "por motivo de raza, color, sexo, **nacimiento**, origen o condición social, ni ideas políticas o religiosas."

El legajo de la Convención Constituyente refleja un intenso debate en torno al nacimiento **y una clara intención de hacer desaparecer las diferencias jurídicas que mantenían marginados a los hijos nacidos fuera del matrimonio**. <u>Diario de Sesiones de la Convención Constituyente</u>, Equity, (1961), págs. 1347-1376. Así, el Informe de la Comisión sobre la Carta de Derechos, hizo constar que se eliminaría el estigma jurídico de tales hijos, **colocándolos en igualdad de derechos respecto a sus padres y el orden jurídico**. <u>Diario de Sesiones</u>, <u>supra</u>, págs. 2561-2562.

Este ideal tuvo su culminación judicial en <u>Ocasio</u> v. <u>Díaz</u>, 88 D.P.R. 676, 728 (1963), al decidir que "no debemos perdernos en el laberinto de las **injustas distinciones**. En la interpretación y aplicación de ellas el postulado básico de igualdad humana ante el Derecho debe ser el faro que nos encamine en la jornada más honrosa, pero también más ingrata,..., **la de hacer justicia a [nuestros] semejantes. Igualdad para el anciano y para el niño en recibir participación en el disfrute de todo derecho sustantivo, igualdad para todos en el trato jurídico ante el derecho adjetivo en todo proceso de reivindicación social o patrimonial**". (Énfasis suplido).

Con este sucinto, pero trascendental trasfondo constitucional, concluimos que el requisito de matrimonio, y por ende, la prohibición en caso de concubinato en situaciones de pluralidad de adoptantes, establecido por el Art. 131[17] de la Ley de Adopción –Núm. 86 de 15 de junio de 1953–, **crea un discrimen por nacimiento bajo nuestra Constitución. Elaboremos.**

Como es sabido, la adopción, es hoy, la institución por la cual "una persona se integra plenamente en la vida de familia de otra, con los mismos efectos que produce la filiación biológica, rompiéndose los vínculos jurídicos que el adoptado tenía con la familia anterior." Antonio J. Pérez Martín, <u>Derecho de Familia: Adopción, Acogimiento, Tutela y Otras Instituciones de Protección de Menores</u>, Ed. Lex Nova, p. 487, 1995. Desde sus inicios en Roma, la adopción estaba fundada en motivaciones económicas, sociales o políticas para darle continuidad a la estirpe.[18] Esta limitada concepción, con el tiempo experimentó un giro radical; **actualmente la figura central es el adoptado**. Así nuestra ley, al recoger ese nuevo enfoque, **equipara al hijo adoptado con el hijo biológico,[19] y crea entre el adoptado y el adoptante la misma situación que la filiación por nacimiento**. <u>Rivera Rivera</u> v. <u>Monge Rivera</u>, 117 D.P.R. 464, 466 (1986); <u>León Rosario</u> v. <u>Torres</u>, 109 D.P.R. 804, 815 (1980); <u>Ex parte J.A.A.</u>, <u>supra</u>, 558; <u>Rivera Coll</u> v. <u>Tribunal Superior</u>, 103 D.P.R. 325, 332 (1975).

La filiación "alude a la génesis y al status de la

---

[17] Art. 131 Código Civil, 31 L.P.R.A. sec. 532.

[18] <u>M.J.C.A.</u> v. <u>J.L.E.M.</u>, 124 D.P.R. 910, 916 (1989). Véase: Rosa María Moreno Flores, <u>Acto Constitutivo de la Adopción</u>, Ed. Colex, (1985); José Rafael León Sotomayor, <u>La Adopción en Puerto Rico</u>, 31 Rev. Der. Pur. 13 (1991).

[19] El Art. 132 del Código civil lee: "El adoptado será considerado para todos los efectos legales como un hijo legítimo del adoptante. El adoptante será considerado como el padre legítimo del adoptado. 31 L.P.R.A. sec. 533.

persona. Es el cauce primario y básico de las relaciones de parentesco. Aunque el concepto de relación de parentesco tenga otros desenvolvimientos, el punto de partida está constituido siempre por la filiación." Luis Martínez Calcerrada, _Discriminación de la Filiación Extramatrimonial_, Ed. Montecorvo S.A., 1977. En esta vena en _Almodóvar_ v. _Méndez_, 125 D.P.R. 218, 232 (1990), con aprobación citamos a Serna Meroño, y resolvimos que la filiación, **bien sea natural o por adopción**, origina una serie de derechos y obligaciones entre los miembros de la familia, dando seguridad y publicidad al estado civil de la persona.

**En su sustrato la adopción es un nuevo nacimiento**. A través del acto judicial, el adoptado adviene a un nuevo estado civil, y con éste, surgen para él y para los adoptantes una serie de derechos y deberes.

**Preciso recalcar que el nacimiento biológico de por sí, no brinda a la persona un estado civil; es el acto de la filiación el que lo sitúa en una perspectiva jurídica.** Como dice Ruth Ortega-Vélez, el nacimiento como realidad biológica, llevado al ámbito de lo jurídico resulta en la filiación. R. E. Ortega-Vélez, _25 Lecciones Derecho de Familia_, Ed. Scisco, (1997), p. 227. Nuestro ordenamiento cuenta con dos (2) formas de filiación, a saber, la biológica y la adoptiva; y sin importar a que tipo de filiación nos refiramos, el propósito y las consecuencias de éstas son las mismas. **Por esta razón, cuando bajo la Constitución hablamos de discrimen por razón de nacimiento, no sólo nos referimos al hecho biológico del nacimiento, sino también al jurídico de la filiación.**

III

**El presente caso es excepcional.** Ariel Pérez Vega y Ada Román Padilla desean **conjuntamente** adoptar a la menor A.M.Q.M., quien desde los veinte (20) días de nacida es su hija. No se cuestiona que han convivido en una relación concubinaria ininterrumpida durante los últimos diez (10) años, procreado hijos y mantenido una familia estable. La propia Procuradora Especial de Relaciones de Familia así lo reconoció cuando señaló, que recomendaría favorablemente la adopción, **por entender**

que el bienestar de la menor estaba garantizado por la relación afectiva **con los peticionarios**; pero, que por no estar casados, la ley la obligaba a oponerse.

La Procuradora Especial se refería al Art. 131 del Código Civil que establece que "nadie podrá ser adoptado por más de una persona, salvo el caso en que los adoptantes estuvieren casados entre sí...." **Esta norma, es conocida como la prohibición de pluralidad de adoptantes.** Tiene como **único fundamento** evitar el posible conflicto que puede surgir entre hombre y mujer no vinculados sentimental y físicamente, y que a su vez pretendan compartir deberes y responsabilidades paterno-materno filiales para con el adoptado, como lo son la patria potestad y la custodia.

El alcance de esta prohibición debe entenderse a la luz del propósito cardinal de nuestra Ley de Adopción, esto es, "que al adoptado se le provea, con carácter permanente, un hogar donde se le brinde cariño, cuidado, protección y seguridad económica, social y emocional, así como lo esencial para un crecimiento y desarrollo saludable en un medio ambiente donde disfrute **sin distinciones de los mismos derechos y asuma las mismas obligaciones que los hijos biológicos.**" M.J.C.A. v. J.L.E.M., 124 D.P.R. 910, 922 (1989).

Incuestionablemente, la familia compuesta por Ariel Pérez Vega y Ada Román Padilla, ha brindado un hogar a la menor A.M.Q.M. Por años, de forma voluntaria, han realizado los deberes y responsabilidades inherentes a la patria potestad, brindándole amor y cuidado desde la cuna. **Ese desprendimiento de sentimientos paterno-materno filiales ha sido espontáneo, sin obligación legal alguna. Simplemente responde, a que para ellos "la familia existe no ya por ser el hijo habido en matrimonio, o por ser natural reconocido, sino por la posesión de estado que da lugar al afecto y lo justifica."** Rosa María Moreno Florez, Acto Constitutivo de la Adopción, Ed. Colex, (1985), citando a Coll J. E. y Estivill, L. A., pág. 36.

Lamentablemente, la interpretación stricto jure de seguir literalmente la letra del Art. 131, conllevaría que la menor A.M.Q.M.

nunca podría consolidar en el seno de esta familia, la filiación física y espiritual que ya existe; sólo porque el "padre" y la "madre"[20] no están casados. **Semejante resultado choca con el postulado multidimensional de igualdad y dignidad constitucional, inmerso en nuestra conciencia judicial.**

IV

Hace varias décadas, en <u>Ocasio</u> v. <u>Díaz</u>, <u>supra</u>, sostuvimos el derecho de los hijos a la **absoluta igualdad de trato jurídico.** En esa ocasión erradicamos las distinciones jurídicas entre hijos legítimos e ilegítimos. **Hoy hacemos lo propio con las diferencias entre el hijo adoptado y el biológico, y evitamos una paternidad y maternidad fragmentada.**

Un menor, al ser adoptado se convierte en hijo sin cualificaciones y debe tener los mismos derechos que un hijo biológico. **Rechazamos así la existencia de una diferenciación injustificable en el trato jurídico.**

**En resumen, bajo la igualdad constitucional que gozan**

---

[20] Véase opinión disidente del Juez Asociado Cadilla Ginorio en <u>Rosell</u> v. <u>Meléndez</u>, 101 D.P.R. 329 (1973) en la que desarrolla el concepto de progenitores sicológicos.

los hijos dentro o fuera del matrimonio, el hijo adoptivo, tal como el biológico, tiene derecho a "nacer" en el seno de una pareja de concubinos.


ANTONIO S. NEGRÓN GARCÍA
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Ariel Pérez Vega y
Ada Mary Román Padilla

    Apelantes

                            AC-95-16

       v.


Procurador Especial de
Relaciones de Familia

    Apelada

Opinión Disidente emitida por la Juez Asociada señora Naveira de Rodón




San Juan, Puerto Rico, a 27 de abril de 1999




> Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. ***Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana***. Art. II, Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico.


      La interpretación que del Art. 131 del Código Civil, 31 L.P.R.A. sec. 532, hace la mayoría de éste Tribunal, como bien señala el Juez Asociado señor Negrón García, en su Opinión disidente, atenta y altera el principio consagrado en nuestra

constitución referente a la igualdad por razón de nacimiento.   A continuación expondremos nuestro criterio.

I

El 28 de enero de 1994, los apelantes Ariel Pérez Vega y Ada Mary Román Padilla, solicitaron al entonces Tribunal Superior, Sala de Arecibo, la adopción de la menor A.M.Q.M.  Indicaron que eran solteros y convivían como marido y mujer hacía doce (12) años.  Además, señalaron que tenían bajo su protección y custodia a la menor A.M.Q.M. desde que la misma tenía veinte (20) días de nacida.  La menor contaba al momento de presentarse la petición de adopción con diecinueve (19) meses de edad.

La Procuradora Especial de Relaciones de Familia se opuso a la adopción conjunta de ambos apelantes por no estar casados entre sí, aduciendo que ello era contrario a lo dispuesto en el Art. 131 del Código Civil, supra.  Expresó que los requisitos para ser adoptante son jurisdiccionales, según lo expresado en M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910 (1989).  Sin embargo, señaló que "[a]un cuando **recomendaríamos favorablemente la adopción, por entender que el bienestar de la menor está garantizado por la relación afectiva entre los posibles adoptantes**, la ley nos obliga para el descargo responsable de [nuestra] función de tener que circunscribir[nos] a la letra de la ley".  (Énfasis nuestro.)

El tribunal de instancia, mediante sentencia de 28 de marzo de 1995, declaró con lugar la petición de adopción.  Inconforme, la Procuradora Especial de Relaciones de Familia, a través del Procurador General, presentó un escrito de apelación en el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito).  Alegó que había errado el tribunal de

instancia al autorizar la adopción, contrario a lo dispuesto por el Art. 131 del Código Civil, supra. El Tribunal de Circuito, mediante sentencia de 23 de agosto de 1995, revocó la decisión del foro de instancia. Interpretando literalmente la ley, determinó que personas que no estuvieran casadas no podían adoptar conjuntamente. En cuanto al planteamiento constitucional levantado por los apelantes, el Tribunal de Circuito resolvió que la protección constitucional contra el discrimen fundado en la condición social de las personas, goza de una naturaleza económica únicamente, por lo que sometió al Art. 131, supra, al llamado escrutinio tradicional. Por consiguiente, sostuvo la constitucionalidad del mencionado artículo.

Los apelantes presentaron ante nos el 26 de septiembre de 1995 un recurso de apelación, solicitando la revocación del dictamen del Tribunal de Circuito. Alegaron la comisión de un solo error, a saber:

Erró el Honorable Tribunal de Circuito de Apelaciones, Circuito Regional III (Arecibo) al resolver que, en las circunstancias de este caso, el requisito establecido por el Artículo 131 del Código Civil vigente (31 L.P.R.A. [sec.] 352) de que para poder adoptar una pareja tiene que estar legalmente casada, no constituye uno [sic] discrimen o clasificación no permitida por las secciones 1, 7 y 8 del artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

Mediante resolución de 28 de diciembre de 1995, acogimos el presente recurso de apelación y ordenamos a las partes que presentaran sus respectivos alegatos.

II

La figura de adopción ha sido definida como el acto "en virtud del cual la voluntad de los particulares, con el permiso de la ley y la autorización judicial, crea entre dos personas, una y otra naturalmente extraña, relaciones análogas a la de la filiación legítima." Es decir, la adopción equipara al hijo adoptado con el hijo biológico, y crea entre el adoptante y el adoptado la misma situación que la filiación por nacimiento. Feliciano Suárez, *Ex parte*, 117 D.P.R. 402, 406 (1986).

Mediante la Ley Núm. 86 de 15 de junio de 1953, el legislador puertorriqueño incorporó a nuestro ordenamiento jurídico un nuevo esquema para regir la figura de la adopción. **El propósito de esta medida fue darle padres a niños que no los tuvieran o cuyos padres biológicos no los pudieran atender debidamente**. Diario de Sesiones de la Asamblea Legislativa, Vol. II, págs. 1292 y 2372 (1953). Nuestra legislación sobre adopción es de las más **avanzadas y liberales** en todo el mundo. Ex parte J.A.A., 104 D.P.R. 551 (1976). **Esta legislación se dirige a buscar el bienestar y la felicidad del menor, no la de sus padres**. Id, pág. 2376. "Se persigue el propósito de que al adoptado se le provea, con carácter permanente, un hogar donde se le brinde cariño, cuidado, protección y seguridad económica, social y emocional, así como lo esencial para un crecimiento y desarrollo saludable en un medio

ambiente donde disfrute sin distinciones de los mismos

derechos y asuma las mismas obligaciones que los hijos

biológicos". M.J.C.A., menor v. J.L.E.M., menor, supra,

pág. 922. Debemos destacar que esta medida no contó con

una exposición de motivos, ya que la misma fue eliminada

porque los legisladores consideraron que era muy

abarcadora y general. Diario de Sesiones, supra, pág.

1839.

Para poder ser adoptante, se tiene que cumplir con

ciertos requisitos sustantivos. Según hemos resuelto,

los mismos son de carácter jurisdiccional. M.J.C.A.,

menor v. J.L.E.M., menor, supra, pág. 921; Ex parte

Warren, 92 D.P.R. 299 (1965). Uno de estos requisitos

es el número de adoptantes que pueden concurrir en una

adopción. En específico, dispone el Art. 131 del Código

Civil lo siguiente:[21]

> Nadie podrá ser adoptado por más de una persona, salvo el caso en que los adoptantes estuvieren casados entre sí. Los cónyuges deberán adoptar conjuntamente, salvo los casos en que estén separados o uno de ellos esté incapacitado, en cuyos casos habrá que notificar la solicitud al otro cónyuge.

> Si la persona a quien se propone adoptar fuere hijo de uno de los cónyuges, su consorte podrá adoptarlo y la persona así adoptada será considerada hija de ambos. A este último efecto no será considerado incapacitado un cónyuge por el hecho de ser menor de edad si el otro reúne los requisitos de edad que fija la sec. 531 de este título.

---

[21] Las disposiciones sobre la adopción del Código Civil fueron enmendadas sustancialmente mediante la Ley Núm. 8 de 19 de enero de 1995. Más adelante analizaremos esta legislación.

Según la interpretación que de este artículo hace la mayoría, para que dos personas puedan adoptar conjuntamente, es necesario que estén casadas entre sí. Sin embargo, el segundo párrafo de este artículo claramente refleja que la intención legislativa fue una distinta. Este artículo lo que hace es cualificar la adopción por parte de personas casadas exigiendo a los cónyuges adoptar conjuntamente. El Art. 131 del Código Civil, supra, establece limitadas excepciones. Permite la adopción por separado por parte de los cónyuges cuando éstos están separados o uno de ellos está incapacitado.[22] El requisito de adopción conjunta para personas casadas es uno lógico y lo que pretende es armonizar la figura de adopción con las obligaciones que la ley establece para la institución del matrimonio. No debemos darle mayor alcance. Su propósito es darle viabilidad a la adopción sin desarticular las obligaciones dimanantes de tan importante institución.

Cabe señalar que en el supuesto de la excepción que establece el Art. 131 del Código Civil, supra, permitiendo la adopción por separado de personas casadas habrá un matrimonio constituido legalmente, pero

---

[22] Al redactar este artículo, el legislador tomó en consideración los posibles problemas que podrían generar las adopciones por uno solo de los cónyuges. Por eso, estableció la norma de que, como regla general, adoptaran ambos cónyuges conjuntamente. De otra forma, podrían surgir diversos problemas en las relaciones familiares y entre los cónyuges, tales como las cuestiones de alimentos entre parientes, el sustento del menor adoptado cuando los cónyuges están casados bajo el régimen de sociedad de gananciales (donde le toca a la sociedad alimentar el hijo de cualquiera de los cónyuges) o bajo cualquier otro régimen (capitulaciones

solamente uno de los cónyuges será el padre o madre del menor a ser adoptado. Esta situación crea una **"familia atípica"**, ya que sería uno solo de los dos cónyuges el que se consideraría como padre o madre del menor.[23]

Consideramos que el propósito de este artículo, al exigirle a dos personas casadas que adopten conjuntamente, no impide el que dos personas que no estén casadas y vivan consensualmente puedan adoptar.

Por otro lado, es menester señalar que este artículo establece claramente que **una persona soltera** puede adoptar. Cuando esto ocurre, también se estaría formando una familia con un solo padre o madre, fuera de la figura del matrimonio. Tendríamos a un menor criándose con un solo padre o madre adoptivo(a). Además, según resolvimos en Ex parte J.A.A., supra, no existe ningún impedimento para que el hijo de una persona que vive en una relación consensual con otra, pueda ser adoptado por dicha persona, con lo que se estaría formando una familia con padres que no están casados entre sí.

Existe otro aspecto interesante, y es que la ley de adopción de 1953, no prohibía que dos personas que sostuvieran una relación consensual, pudieran adoptar individualmente y en diferentes acciones a un mismo menor. De esta manera, ambos se convertían para todos

---

matrimoniales), la coadministración de los bienes de la sociedad de gananciales, los deberes de ayuda y socorro mutuos entre los cónyuges, entre otros.

los fines legales en sus padres, sin tener que adoptar en forma conjunta. Nada vemos en la ley actual que demuestre la intención del legislador de cambiar esta política pública.

Debemos destacar ciertas expresiones que hizo el representante Ramírez Irizarry en el debate legislativo de la Cámara de Representantes previo a la aprobación de esta ley:

> **[L]a doctrina moderna y la doctrina correcta, en materia de adopción, es que sean los organismos que conocen de cada caso de adopción en sus detalles, los que determinen, a base de los méritos de cada caso, si debe aceptar o permitir la adopción, o si debe negar la adopción.**
>
> ... [E]l proceso de adopción requiere un lento y cuidadoso estudio de cada caso en particular llevado a cabo en Puerto Rico por la agencia de Bienestar Público y luego, además de ese estudio, la Corte celebrar una vista donde se consideren detenidamente todos los aspectos que en el caso particular permiten o niegan la adopción.
>
> ........
>
> El proyecto en su totalidad está inspirado en la teoría que expuse antes, de que no es la Legislatura la que de antemano va a imponer esas trabas [para adoptar], sino que son la corte y la agencia de Bienestar Público las que van a imponer esas trabas en el caso particular de que se trate. (Énfasis nuestro.) Diario de Sesiones, supra, págs. 1463-64.

Como se puede apreciar, la intención principal de la Asamblea Legislativa al aprobar esta ley, fue que se

---

[23] Se debe destacar que el Art. 131 del Código Civil, supra, nada dispone para cuando cese la incapacidad del cónyuge o los cónyuges se reconcilien, esto es, si están o no obligados ambos a adoptar.

velara por el bienestar y la seguridad de los menores.[24]
Según hemos discutido, la ley de adopción no prohibe que
una persona soltera o que viva sola pueda adoptar a un
menor.  El legislador pensó que este tipo de familia
también es fuente de estabilidad y podría propender al
bienestar del menor.  Distinto a la mayoría entendemos
que, de igual forma debe tratarse la adopción hecha por
dos personas conjuntamente, aún cuando no estén unidas
por el vínculo del matrimonio.[25]

Para analizar de una manera más amplia y completa
la controversia ante nos, es necesario que examinemos
brevemente la nueva ley de adopción, Ley Núm. 8 de 19 de
enero de 1995.

Esta ley se implantó con el propósito de
"flexibilizar la institución de la adopción para que
ésta pueda ser utilizada ampliamente por personas que
desean adoptar menores de edad".  Exposición de Motivos
de la Ley Núm. 8, supra. Según el Informe de la Comisión
de lo Jurídico Civil de la Cámara de Representantes de 7
de diciembre de 1994, "el principio rector y la
finalidad de [la adopción], es **el beneficio del
adoptado**; lo que debe predominar frente a las ventajas
que pueda ofrecer al adoptante".  Informe, supra, pág.
11.

---

[24]     Además, véase Opinión Concurrente del Juez Asociado señor Negrón García
en Ex parte J.A.A., supra, págs. 560-62.

[25]     No estamos expresándonos en este momento sobre la posibilidad de que
parejas del mismo sexo, o personas que vivan juntas pero no consensualmente,

Por su parte, la Exposición de Motivos de esta medida señala que "[l]a Asamblea Legislativa entiende que es imperativo flexibilizar la institución de la adopción para que ésta pueda ser utilizada ampliamente por personas que desean adoptar menores de edad. Los niños de Puerto Rico merecen tener la oportunidad de que sus vidas se desarrollen al calor de un hogar, sintiendo el amor de unos padres. La institución de la familia es el pilar principal de nuestra sociedad, por lo tanto hay que brindarle a esos niños la oportunidad de formar parte de un seno familiar".

Cabe señalar que en cuanto al número de adoptantes, la nueva ley no hizo cambios sustanciales. El Art. 133 del Código Civil, según enmendado por la Ley Núm. 8 de 1995, dispone lo siguiente:

> Nadie podrá ser adoptado por más de una persona, salvo que los adoptantes estuvieren casados entre sí en cuyo caso se deberá adoptar conjuntamente.
>
> Un cónyuge podrá adoptar individualmente en cualquiera de los siguientes casos:
>
> (1)    Cuando desee adoptar al hijo menor de edad del otro cónyuge.
> (2)    Cuando esté separado de su cónyuge, por lo menos durante los dos (2) meses anteriores a la fecha de la presentación de la petición, en cuyo caso habrá de notificarse dicha solicitud al otro cónyuge.
> La subsiguiente reconciliación de los cónyuges no impedirá el derecho del peticionario a adoptar individualmente, excepto que por acuerdo de ambos, el matrimonio podrá adoptar conjuntamente si así lo decretare el tribunal, considerando siempre como eje central el bienestar y conveniencia del adoptado.
> (3)    Cuando por decreto judicial el cónyuge del adoptante tenga restringida su capacidad jurídica, mientras dure dicha restricción, en cuyo caso habrá de notificarse dicha solicitud al otro cónyuge.
>
> De otra parte, con esta ley se buscó flexibilizar el procedimiento de adopción, para que los niños en Puerto Rico que necesitaran un hogar, pudieran ser adoptados rápidamente y se integraran al seno de una familia. Esta familia, según reconoce la propia ley, puede estar formada por un matrimonio o por una persona soltera. Esta ley tampoco prohíbe expresamente el que una pareja, que vive

puedan adoptar conjuntamente por no estar estas situaciones ante nuestra consideración y, por ende, no ser este el caso apropiado.

consensualmente, adopte a un menor.  Es por eso que, siempre buscando el bienestar del menor, no encontramos razón válida alguna que justifique el prohibir que una pareja que convive **sin casarse** pueda adoptar a un niño y ofrecerle un hogar, **una familia**, es decir, la estabilidad necesaria para su desarrollo y bienestar.

Como podemos observar, la interpretación que da la mayoría a la intención del legislador, al enmendar el Art. 131 del Código Civil, supra, esto es que, mantuvo el matrimonio como requisito jurisdiccional para la adopción conjunta, menoscaba precisamente el propósito primordial de la nueva ley de adopción -el bienestar del menor-.

De acuerdo con la mayoría, el legislador pasó por alto aquellas personas que en Puerto Rico están favoreciendo la opción de las uniones consensuales para formar una familia.  De hecho, el vivir como pareja sin casarse es una forma de vida que cada día más personas están utilizando.

Estas relaciones, tal y como ocurre con los matrimonios, sufren vaivenes y están expuestas a disolverse.  Pero esto, de por sí, no implica que las relaciones consensuales estén condenadas al fracaso, o que las personas que deciden voluntariamente entrar en ellas no sean aptas, o estén moralmente impedidas de funcionar en la sociedad como ciudadanos exitosos y padres responsables, trabajando para conseguir una familia feliz y funcional.  Tampoco implica todo lo contrario.  Es decir que los matrimonios no estén avocados al fracaso o que todas las personas casadas sean aptas y estén moralmente capacitadas para ser buenos padres.[26]

**III**

Como hemos visto, la mayoría interpreta que el legislador, al redactar el Art. 131 del Código Civil, supra, prohibió el que personas no casadas que conviven entre sí pudieran adoptar conjuntamente a un menor.  Esta interpretación es una equivocada que crea un discrimen por razón de nacimiento.  Sec. 1, Art. II de Nuestra

---

[26]      Véase, El Informe Anual de Estadísticas Vitales del Departamento de Salud de Puerto Rico de 1994.  En dicho informe se señala que en el 1994, se celebraron 33,200 matrimonios y 13,724 divorcios.

La tasa tan alta de divorcios en nuestro país (13,724 en 1994) evidencia que la institución del matrimonio no necesariamente es una "fuente de estabilidad,

Constitución, supra.  Más aún, crea una categoría distinta de menores a los cuales no se les permite tener un padre y una madre por el solo hecho de ser adoptados y, por ende, no tienen todos los derechos sustantivos e igualdad de trato ante la ley que tiene un hijo biológico.  Nos explicamos, la interpretación que hoy hace la mayoría del Art. 131, supra, permite que un hijo biológico puede ser adoptado por la pareja consensual de su padre o madre biológico.  Lo mismo no ocurre con el hijo adoptivo.  Este no puede ser adoptado por la pareja consensual de su padre o madre adoptivo.  Esta dicotomía resulta inaceptable.

En consecuencia, la interpretación que del Art. 131, supra, hace la mayoría, atenta con lo resuelto por este Tribunal hace más de treinta (30) años en Ocasio v. Díaz, 88 D.P.R. 676, (1963) el cual estableció "igualdad ante la ley para todos los hijos."

**IV**

Finalmente, debemos tener en cuenta que la menor A.M.Q.M. solo ha conocido como padres a los aquí apelantes Ariel Pérez Vega y Ada Mary Román Padilla.  Desde los veinte (20) días de nacida ha vivido con ellos como una familia.  Bajo los hechos específicos de este caso, tal como resolvió el tribunal de instancia, procede la adopción.  Los apelantes llevan más de doce años conviviendo como pareja, han procreado hijos y

---

protección y educación", según expresa la mayoría en su Opinión.  Estas son las

mantienen una familia unida, un hogar estable. Cabe señalar que la Procuradora de Relaciones de Familia consideró que la adopción de la menor por estas personas redundaría en su bienestar y seguridad. Ni la ley ni los tribunales deben o pueden exigirle a los apelantes que contraigan matrimonio como requisito indispensable para poder adoptar a la menor. El que estén casados no garantiza el bienestar y la estabilidad familiar que la ley persigue. Véase, Efraín González Tejera, Bienestar del menor: señalamientos en torno a la patria potestad, custodia y adopción, 54 Rev. Jur. U.P.R. 409, 471 (1985).

Por las razones que anteceden, revocaríamos la sentencia emitida por el Tribunal de Circuito y confirmaríamos la del tribunal de instancia. En consecuencia, disentimos del dictamen de la mayoría.

                                        Miriam Naveira de Rodón
                                             Juez Asociada

---

estadísticas vitales más recientes que hemos podido encontrar.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ariel Pérez Vega y
Ada Mary Román Padilla

    Apelantes


       vs.                           AC-95-16


Procurador Especial de
Relaciones de Familia

    Apelado


    **Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI.**


En San Juan, Puerto Rico, a 27 de abril de 1999.


Una de las enmiendas más importantes que se le hizo en 1995 a nuestro ordenamiento jurídico en lo que respecta a la adopción, fue la que añadió el último párrafo del vigente Artículo 133 del Código Civil de Puerto Rico. Dispone ese párrafo que:

> "El tribunal tendrá discreción para resolver situaciones como las dispuestas en esta sección, teniendo siempre como guía para su decisión el bienestar y conveniencia del menor."

La razón de ser y el sentido propio de esta enmienda surge de modo claro cuando se examina el desarrollo de nuestra jurisprudencia sobre la adopción. Veamos.

Reiteradamente hemos señalado que nuestra legislación sobre la adopción **"es producto de nuestra autoctonía"**. Feliciano Suárez, Ex-parte, 117 D.P.R. 402 (1986); Ex-parte J.A.A., 104 D.P.R. 551 (1976); Rivera Coll v. Tribunal Superior, 103 D.P.R. 325 (1975). Se trata de una figura jurídica cuyos contornos concretos se han delimitado con arreglo a nuestras realidades y valores particulares.

Parte importante de la evolución autóctona de nuestra figura jurídica de la adopción ha sido su desarrollo jurisprudencial. En numerosas ocasiones ha sido este Tribunal el foro que ha atendido problemas y situaciones novedosas, pautando para ellas normas particulares que han ampliado y complementado nuestro acervo jurídico sobre la adopción. En efecto, en casos como Feliciano Suárez, Ex-parte, supra; Ex-parte J.A.A., supra; Rivera Coll v. Tribunal Superior, supra; Ex-parte Warren, 92 D.P.R. 299 (1965); Valladares de Sabater v. Rivera Lazú, 89 D.P.R. 254 (1963); Ex-parte Ortiz y Lluveras, 42 D.P.R. 350 (1931), y otros, este Tribunal ha resuelto situaciones noveles, que no habían sido reguladas concretamente por el legislador, y hemos formulado las normas pertinentes. En los casos aludidos, para preceptuar la nueva pauta aplicable a la situación particular ante nuestra consideración, nos hemos guiado por dos principios medulares, a saber: (1) que el estatuto sobre adopción debe ser interpretado liberalmente a favor del adoptado; y, (2) que el interés primordial a protegerse es el mejor bienestar del menor.

Al enmendarse nuestra legislación sobre la adopción en 1995, el legislador seguramente conocía la trayectoria evolutiva de esta figura jurídica en nuestra jurisdicción, y conocía el papel importante que había desempeñado este Tribunal en el desarrollo autóctono de ella. En particular, estaba evidentemente consciente de la necesidad de dejar a la discreción judicial la encomienda de pautar situaciones que no estuviesen reguladas específicamente por el estatuto y que surgiesen en el futuro relativas a este asunto. Se explica así la delegación expresa para ello dispuesta en el referido último párrafo del Artículo 133 del Código Civil de Puerto Rico.

II

Aclarado lo anterior, me parece evidente que en el caso de autos encaramos una situación muy particular que, por no estar concretamente preceptuada en la legislación sobre adopción, nos toca resolver, conforme a lo que mejor convenga al bienestar del menor.  Tenemos ante nos el caso de una niña que, **desde recién nacida**, ha estado bajo la protección y custodia de una pareja consensual heterosexual, que desde hace dieciséis (16) años conviven como marido y mujer.  Ambos desean adoptar a la menor, quien no ha conocido otro padre y otra madre que no sean el hombre y la mujer que ahora la quieren adoptar.  Por estas circunstancias, los integrantes de la pareja aludida son las personas **más idóneas** para convertirse mediante la adopción en el padre y la madre legítimos de la menor, como lo reconoce la propia Procuradora de Relaciones de Familia.

**No cabe duda de que cualquiera de los dos peticionarios por sí solos podría adoptar a la menor**. Así lo dispone expresamente nuestro Código Civil.  Por ello, la cuestión concreta realmente ante nos es la siguiente:  **¿qué conviene más para el bienestar de la menor, que sea adoptada por uno solo de estos dos padres afectivos o de crianza de ella, o que sea adoptada por ambos?**

Como hemos señalado antes, uno de los objetivos de la adopción es crear, por ficción jurídica, relaciones análogas a las de la filiación legítima.  Ex-parte Warren, supra.  Lo ideal es darle **padre y madre** al niño adoptado que sustituyan al padre y a la madre biológica, y que el niño logre integrarse plenamente con la familia adoptante.  Por ello, no puede haber duda alguna, que en una situación como la de autos, lo más conveniente es que la pareja consensual, **que son a quienes la menor conoce como su padre y su madre**, puedan **ambos** adoptarla.  No tendría ningún propósito social de beneficio para la menor que sólo uno de ellos dos la adoptase.

Frente a esta innegable realidad sociológica, no está justificado extender a esta situación tan particular el requisito general de que

para que un menor sea adoptado por más de una persona, éstas deben estar casadas entre sí.

No tengo duda de que sería muy propio y deseable que la pareja en cuestión formalizara la relación que existe entre ellos contrayendo matrimonio. Pero también considero inconsecuente que el Estado los **obligue** a casarse, como condición para que puedan hacer juntos lo que cualquiera de ellos puede hacer individualmente. Aparte de lo vacuo que sería tal acto matrimonial, contraído careciendo del esencial elemento de auténtica voluntariedad, lo más probable es que la pareja ni llegue a casarse, porque tiene otra alternativa más conveniente a sus propósitos en este asunto. Sin contraer matrimonio, uno de los dos peticionarios puede adoptar a la menor, quien entonces continuará viviendo con la pareja consensual tal como ha sucedido hasta ahora. En resumen, pues, el **resultado probable** del dictamen mayoritario en el caso de autos no ha de ser la formalización de la unión consensual de la pareja en cuestión. Tampoco, ha de ser lo mejor para el bienestar de la menor. **Sólo ha de lograrse con tal dictamen que en lugar de la menor tener padre y madre con todas las de la ley, sólo tendrá uno de ellos**.[27] No veo como este resultado es lo que más le conviene a la niña en cuestión, ni al interés legítimo de la mayoría por proteger la institución del matrimonio, que yo comparto plenamente. Es por ello que disiento del dictamen mayoritario.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

---

[27] La otra consecuencia concebible del dictamen mayoritario sería que **la pareja no adopte a la menor**. Ello sería verdaderamente **lamentable**, porque entonces la niña no tendría todo el beneficio de la filiación legítima de parte de aquellos que han sido sus verdaderos padres, y las personas más idóneas para ello.